IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MOLINA INFORMATION SYSTEMS, LLC,

        Plaintiff,

v.

UNISYS CORPORATION,

        Defendant.

Civil Action No. 12-1022-RGA

MEMORANDUM OPINION

A. Thompson Bayliss, Esq., ABRAMS & BAYLISS LLP, Wilmington, DE; James N. Kramer, Esq. (argued), ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, CA; Justin Bagdady, Esq. (argued), ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, CA.

    Attorneys for Plaintiff Molina Information Systems, LLC.

Philip Trainer, Jr., Esq., ASHBY & GEDDES, Wilmington, DE; Stephen R. Neuwirth, Esq., (argued), QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY.

    Attorneys for Defendant Unisys Corporation.



September  , 2014

ANDREWS, U.S. DISTRICT JUDGE:

Before the Court is Defendant Unisys Corporation's Motion to Dismiss the Second Amended Complaint (D.I. 39) filed on October 30, 2013. The motion is fully briefed (D.I. 40, 41 & 42) and the Court had the benefit of oral argument on June 27, 2014. (D.I. 46). For the reasons that follow, the Court will grant the Defendant's motion to dismiss Count II. The remainder of the motion is denied.

## I. BACKGROUND

This dispute between plaintiff Molina Information Systems, LLC ("Molina") and defendant Unisys Corporation arises out of an asset purchase agreement. Molina, a California corporation, "provides design, development, implementation, and business process outsourcing solutions to state governments for their Medicaid information systems." (D.I. 36 ¶ 16). Unisys is an information systems company that designs, builds, and manages information systems and is incorporated under the laws of Delaware. (*Id.* ¶ 17). Unisys's Health Information Management ("HIM") division, the unit at the center of the case, develops complex Medicaid Management Information Systems ("MMIS") that allow state governments to manage their Medicaid programs. (*Id.* ¶ 1).

Molina Healthcare, Inc.[1] entered into the Asset Purchase Agreement ("APA") with Unisys on January 18, 2010, which transferred Unisys's HIM division to Molina. (*Id.* ¶¶ 2-4). Included in the HIM division were contracts with six states for MMIS services. (D.I. 40, pp. 3-4). The Idaho MMIS was one of the major contracts included in the deal, and Unisys represented that it would be ready for operation by June 1, 2010. (D.I. 36 ¶ 2). Molina alleges that prior to the June 1, 2010 "go-live" date, "key management personnel" at Unisys "knew or

---

[1] Molina Healthcare, Inc. assigned the APA to Molina, a wholly-owned subsidiary. (D.I. 36 ¶ 7).

1

recklessly disregarded" that the Idaho MMIS would be unable to meet Idaho's implementation standards on time because the program was in complete disarray. (*Id.* ¶¶ 3-4). Despite its knowledge of the issues with the Idaho MMIS, Unisys sent Molina updates representing that the Idaho MMIS would be ready for on-time delivery as planned and actively blocked Molina from obtaining information by instructing its employees to limit the flow of information to Molina. (*Id.* ¶¶ 3-6).

Molina closed the transaction on April 30, 2010, in part based on Unisys's false representations that: no material adverse effect had occurred, Unisys was not in breach of any material agreement, and Unisys had not received any notice of material service or performance problems with any products or services being sold to Molina. (*Id.* ¶ 7).

The Idaho MMIS commenced operations on schedule but did not function as intended. According to Molina, the malfunctions associated with the Idaho MMIS resulted in costly Medicaid enrollment delays and caused inaccurate communications to health care providers, which severely disrupted Idaho's Medicaid program in the process. (*Id.* ¶ 9). Molina claims it incurred substantial costs in correcting the numerous urgent problems caused by the faulty Idaho MMIS and suffered severe reputational harm. (*Id.* ¶ 11).

Molina asserts four counts against Unisys in its Second Amended Complaint ("SAC"): common law fraud, negligent misrepresentation, breach of contract, and an action seeking declaratory relief.[2] Unisys has moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted. (D.I. 39). Each count will be addressed in order.

---

[2] The parties did not devote any space in their briefs, nor any time during oral argument, to the declaratory judgment count. Therefore, the Court does not further address that count.

## II. LEGAL STANDARD

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the Complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III. DISCUSSION

### A. Common Law Fraud (Count I)

To state a claim for common law fraud, Molina must plead facts supporting an inference that: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *See Abry Partners V, L.P. v. F*

3

*& W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Molina asserts two bases for its common law fraud claim against Unisys in the SAC. First, Molina alleges Unisys knowingly made false statements in the APA and the Officer's Certificate. (D.I. 36 ¶ 118). Second, Molina contends that Unisys provided knowingly false and misleading reports during the due diligence period prior to Closing. (*Id.* ¶ 119). Unisys counters that Molina's fraud claim must be dismissed because the SAC fails to plausibly plead corporate scienter, fails to plead an actionable misstatement in the Officer's Certificate, and because Molina is contractually barred from alleging extra-contractual fraud. (D.I. 40, pp. 7-18). For the following reasons, Unisys's motion to dismiss Molina's common law fraud claim is denied.

1. *Corporate Scienter Is Plausibly Pled*

Federal Rule of Civil Procedure 9(b), in pertinent part, requires: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). A plaintiff seeking to satisfy this standard with respect to a corporation's fraudulent statement "may do so adequately by alleging that the declarant or anyone at the corporation advising or assisting the declarant or anyone participating in any way in preparation of the allegedly false statement knew or should have known it was false." *ING Bank, FSB v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 355 (D. Del. 2009) ("[T]he factfinder's attention is not limited to the subjective understanding of the corporate representative who made the statement—although the factfinder's consideration also does not stretch so far as to include everyone who was ever affiliated with the corporation.").

As an initial matter, Molina's contention regarding the impact of "the Knowledge of the Seller" provision is not persuasive. Molina argues that the Officer's Certificate was a

4

representation made "to the Knowledge of the Seller," and therefore Unisys expressly affirmed that it had inquired of the necessary MMIS personnel prior to signing the Certificate. (D.I. 41, p. 10). Pursuant to section 4.2(e) of the APA, Unisys was required to deliver at closing an Officer's Certificate certifying the satisfaction of the conditions set forth in sections 9.2(a), (b), and (e). (D.I. 36-1, p. 22). The phrase "to the Knowledge of the Seller" is not present in either the Officer's Certificate or the APA provisions certified by the Officer's Certificate. (*Id.* at pp. 22, 50-51). It makes little sense to infer that this phrase, which does not appear in the pertinent sections of the APA, creates an independent burden on Unisys with respect to the Officer's Certificate. This conclusion is consistent with the Court's understanding of similar "knowledge of the seller" provisions, which are typically used to confine a seller's potential exposure in an M&A deal to the knowledge of select individuals within the seller's corporation.

However, this does not mean that M. Lazane Smith[3] can sign the Officer's Certificate without making *any* attempt to determine, perhaps by asking those in the corporation with first-hand knowledge, whether the representations contained in the Officer's Certificate are accurate. Molina does not expressly state which individuals it believes assisted in preparing the Officer's Certificate and what those persons knew, but what Molina has done is provide copious facts detailing the numerous bugs in the Idaho MMIS and the HIM management team's knowledge of these issues and their severity:

> 34. By mid-March, it was clear to Unisys managers that the project was in danger. On March 17, 2010, in response to the large number of remaining unresolved defects, Peter G. wrote to a Project Manager on the Idaho MMIS team that "[w]e are at a huge risk." On March 18, 2010, he reiterated to key members of the Idaho MMIS team that "[w]e are now at a high risk." Twelve days later, he again wrote to the Idaho MMIS team: "This project is at risk."
> . . . .

---

[3] Ms. Smith is the Senior Vice President of Corporate Development at Unisys.

5

45. Indeed, the Idaho MMIS team missed the April 5, 2010 deadline for completing the [User Acceptance Testing]. This was "not good," Peter G. wrote, for there was now a clear risk that the go-live date would be delayed by 30 days.

46. Things looked even worse on April 22, 2010, when a claims testing report showed that only 22 out of 2000 tested claims had been successful. "Unacceptable is a gross understatement," responded Program Lead Warren I.

47. Given the state of the project, the upcoming May 17, 2010 deadline for pilot testing was "premature," Idaho MMIS Business Excellence Manager Traci T. reported to management team members Peter G., Del B., and Wayne K.

48. On April 28, 2010, two days prior to Closing, the Idaho MMIS team identified a "critical defect" related to claims processing that would impact the go-live date. With no capacity to handle additional problems, Peter G. instructed the team to save the resolution of the defect for after the go-live date.

. . . .

55. That same day, [March 26, 2010,] in discussions with the President of Unisys's HIM business, the Vice President and Chief Information Officer of HIM, another Vice President and Partner of HIM, and an Implementation Manager for the Idaho MMIS about how to respond to the State's letter, Del. B wrote that "100% of the reports failed in their testing . . . [e]ach had multiple issues and we stopped having them test while we regrouped on a plan to retest and validate them before having the state test them." He added that during "the internal retesting of the 60 reports so far, only 4 have passed without us having to fix defects on them." Del. B further informed them that "we have been juggling the balls for some time to keep this going while teams finished construction and testing and filled holes in integration and processing. I thought we could make it, but the last couple of weeks the defects have been piling up."

56. On April 1, 2010, Peter G. disclosed to the management team additional communications from the [Idaho Department of Human Welfare ("IDHW")]. In testing the reporting functions, the agency determined that all of the reports tested as of March 23, 2010 had "severe or major defects." Even more importantly, testers found that features that Unisys claimed to have fixed still had defects. The IDHW admonished Unisys and noted that it was "unclear" as to how Unisys could have passed any reports as "production ready" when all of them had defects.

57. On April 30, 2010, the closing date of the transaction, Del[] B. wrote, in an email to Unisys management, that the State of Idaho was "freaked out" about the status of the Idaho MMIS. That same day, Unisys represented (again) to Molina that there were no material problems with the HIM business.

(D.I. 36 ¶¶ 34, 45-48, 55-57). This strikes the Court as a very large number of critical issues in close proximity to the June 1, 2010 "go-live" date. Not only were there numerous documented problems, but the glitches affected a significant piece of the parties' deal—Idaho was one of only six states with MMIS contracts that were transferred to Molina by the APA. Drawing all

reasonable inferences in favor of Molina, the Court finds it difficult to believe that Ms. Smith was not aware of the very real threat of delay or failure facing the Idaho MMIS. If she was not aware, it seems to me that she should have been prior to signing the Officer's Certificate. Molina ought to be granted the opportunity to flesh out these details in discovery.

2. *Molina Has Pled Misrepresentations in the Officer's Certificate*

Molina has sufficiently alleged that the APA and Officer's Certificate contained false representations and warranties. Included among the allegedly false representations are those contained in sections 5.7, 5.21, 7.2 and 7.12 of the APA. The veracity of the representations contained in these provisions cannot be properly adjudicated at this juncture.

Section 5.7(a) represents that no Material Adverse Effect[4] has occurred, nor to the Knowledge of Seller, "has any event, development or state of circumstances or facts occurred that could reasonably be expected to result in a Material Adverse Effect." (D.I. 36-1, p. 25). Whether the various problems with the Idaho MMIS qualify as a Material Adverse Effect or could reasonably be expected to result in one is not something the Court can adequately address on a motion to dismiss. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.").

Subject to certain exceptions, section 5.21 states that Unisys has not "received any written notice (nor to the Knowledge of Seller, any non-written notice) regarding unresolved, material service or performance problems or deficiencies or unresolved, material claims against Seller" within the last two years. (D.I. 36-1, p. 36). Unisys contends the "claims against Seller"

---

[4] The APA defines "Material Adverse Effect" as "any changes, circumstances, events or conditions ("Effect") that have had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the operations, assets, liabilities, financial condition or results of operations of the Business, taken as a whole." (D.I. 36-1, p. 8).

7

language clearly indicates that this section applies only to communications received from third parties and not internal communications. (D.I. 40, pp. 16-17). Molina counters that "material claims against Seller" are limited to claims by third parties, but that Unisys breached the earlier clause, which recites unresolved "material service or performance problems or deficiencies" and is not limited to third parties. (D.I. 41, p. 14). Molina's interpretation is reasonable, and the Court cannot definitively say it is erroneous at this stage of the litigation.

In section 7.2, Unisys represented that it would grant Molina "reasonable access" to Unisys's books and records, as well as access to Unisys employees "upon reasonable advance request." (D.I. 36-1, p. 40). Molina alleges Unisys interfered with this access by directing employees to withhold documents and other materials and tightly controlling the flow of information from Unisys employees to Molina. (D.I. 36 ¶¶ 74-80). Whether the steps Unisys took to restrict Molina's access to information were "reasonable," as permitted by the APA, is not a determination that is well-suited for resolution on a motion to dismiss.

Section 7.12 requires a party to give prompt notice of the occurrence of any event of which it becomes aware that would reasonably be expected to prevent or materially delay the Closing. (D.I. 36-1, p. 47). According to the allegations in the SAC, Molina would have re-opened negotiations if it had known the truth about the Idaho MMIS's status. (D.I. 36 ¶ 8). This is sufficient to survive a motion to dismiss based on the language in section 7.12.

*3. Molina's Extra-Contractual Representations Survive the Anti-Reliance Provision(s)*

Unisys contends the anti-reliance provisions in the APA and Confidentiality Agreement bar Molina's reliance on any extra-contractual representations. Contracts resulting from arms' length transactions, including those with anti-reliance provisions, are generally upheld under Delaware law, especially when the transaction involves sophisticated parties. *H-M Wexford LLC*

8

*v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003) ("The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").

There are two anti-reliance provisions at issue in this case. They are arguably not 100% consistent. On May 6, 2009, the parties entered into a Confidentiality Agreement containing the following anti-reliance language:

> [Molina] understand[s] and acknowledge[s] that neither Unisys nor any of its directors, officers, advisors, representatives or employees are making any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and nothing contained herein or in the Confidential Information is intended to be, or shall be relied upon as, a promise, representation or warranty, whether as to the past or the future. Only those representations or warranties that are made in a written definitive agreement, if, when and as executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

(D.I. 40-2, p. 3). Section 5.26 of the APA, signed on January 18, 2010, contains its own anti-reliance provision:

> Except for the representations and warranties expressly contained in this Article V or in any other document or instrument delivered by Seller pursuant to this Agreement, neither Seller, nor any other Person makes any other express or implied representation or warranty on behalf of Seller, including any representation or warranty as to the probable success or profitability of the ownership, use or operation of the Business or the Assets by Buyer after the Closing.

(D.I. 36-1, pp. 36-37). The APA expressly incorporates the Confidentiality Agreement through section 12.5: "This Agreement, the Schedules and Exhibits, the Confidentiality Agreement and the other Transaction Documents set forth the entire understanding of the Parties, and supersede all prior agreements and understandings, both written and oral, with respect to the subject matter hereof (other than the Confidentiality Agreement)." (*Id.* at p. 59).

9

Unisys argues these provisions are clear and should be enforced. The Confidentiality Agreement states that neither Unisys nor any of its employees are making any representations or warranties whatsoever regarding the accuracy or completeness of the information it provided to Molina outside of the written agreements. (D.I. 40, p. 13). This, Unisys contends, has the practical effect of barring Molina from relying on extra-contractual information regarding the status of the Idaho MMIS, namely the weekly status reports Unisys issued to Molina. In response, Molina points to language in the APA's anti-reliance provision exempting representations contained "in any other document or instrument delivered by Seller pursuant to this Agreement." According to Molina, the weekly status reports Unisys provided are "other document[s] or instrument[s] delivered by Seller pursuant to this Agreement," and therefore Molina maintains it was permitted to rely on them. (D.I. 41, p. 16). Unisys has a different interpretation of this language, suggesting instead that it exempts only the express representations and warranties contained in the agreements between Unisys and Molina delivered pursuant to the APA's closing requirements. (D.I. 42, pp. 6-7 n.8).

The Court cannot discern who has the correct interpretation of the contractual language at this juncture. Looking at section 5.26, it is not clear what falls within the "documents and instruments" the APA requires Unisys to deliver. Unisys may very well be correct in its position that only closing documents are included. This is Molina's Complaint, however, and reasonable inferences are to be drawn in its favor. Reading the provisions in the light most favorable to Molina, its reliance on the weekly status reports is permissible under the anti-reliance provisions.

## B. Negligent Misrepresentation (Count II)

Molina's negligent misrepresentation claim is dismissed with prejudice. I previously dismissed several counts in Molina's First Amended Complaint, including the negligent misrepresentation count, because I found that they were barred by the APA's statute of limitations. (D.I. 35 at 77). Section 11.1 of the APA exempts only "fraud or intentional or willful misrepresentation" from the 18 month post-Closing survival period, not negligent misrepresentation. (D.I. 36-1, p. 53). However, I permitted Molina to replead the counts I dismissed, provided Molina could show that those claims were not subject to the 18 month survival period.

The SAC did not do this. Instead, it simply regurgitates its previous negligent misrepresentation count, nearly word for word. Molina defends this in its opposition brief by suggesting that negligent misrepresentation is a tort claim and a functional subset of fraud instead of "a creature of contract law." (D.I. 41, p. 18). This does nothing to alter the fact that the APA's statutory language governs the survival period for the parties' representations and warranties, including negligent misrepresentations. The claim remains time-barred. Molina's attempt to reclassify the claim as a tort to circumvent the APA and my previous order of dismissal is ineffective.

## C. Breach of Contract (Count III)

Molina alleges Unisys breached sections 5.11 and 11.2 of the APA. Unisys's motion to dismiss addresses each of those allegations in turn. First, Unisys asserts that the portion of Molina's breach of contract claim that is based on section 5.11 relating to the provision of refurbished hardware and an inadequate number of servers is time-barred by the APA. Second, Unisys contends that the monetary damages caused by a file transmission error constitute an

11

"Assumed Liability" pursuant to section 2.3(b) of the APA, *i.e.*, a liability assumed by Molina for which Unisys is not responsible.

Molina's breach of contract claim turns on matters that are more amenable to a determination at the summary judgment stage. The first issue requires the Court to determine whether the notice described Molina's claim against Unisys in "reasonable detail," as required by the APA's indemnification procedure. This is a factual inquiry. With respect to the second issue, identifying the party liable for the transmission error depends on whether a parenthetical phrase on one side of the word "or" in section 2.3(b) nonetheless modifies the clauses on both sides of the conjunction. Molina's reading is more plausible than the one advanced by Unisys, and at best the provision is susceptible to multiple interpretations. Thus, a ruling on the pleadings against Molina is not appropriate.

Because these questions involve disputed issues of fact and contract interpretation not suitable to resolution on a motion to dismiss, Unisys's motion is denied with respect to the breach of contract claim.

## IV. CONCLUSION

For the reasons stated above, Count II is dismissed with prejudice. An appropriate Order will follow.